IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MICHAEL K. SUSAI,                                    No. C 07-00001 SBA

     Plaintiff,                                  **ORDER**

     v.

B.V. JAGADEESH, et al.,

     Defendants.

_____/

     This matter comes before the Court on defendants' Joint Petition to Compel Arbitration [Docket No. 24], Joint Motion to Dismiss the First Amended Complaint [Docket No. 22], and plaintiff's Request for Judicial Notice [Docket No. 30]. Having read and considered the arguments presented by the parties in the papers submitted to the Court, the Court finds this matter appropriate for resolution without a hearing.  The Court hereby GRANTS defendants' Joint Petition to Compel Arbitration.

**BACKGROUND**

**I.    Background Facts**

     Plaintiff Michel K. Susai founded defendant NetScaler, Inc. ("NetScaler") in 1997 to develop and sell products for delivery of information over the internet using so-called "content switching" technology. FAC ¶¶ 14, 15. During the first five years of the company's existence, it went through several rounds of financing and consequent changes in its board of directors and management. *Id.* at ¶¶ 17-28. By 2000, defendant Gabriel Venture Partners, L.P. ('Gabriel') had become a major investor in NetScaler, and its nominee to the company's board was defendant Bolander. *Id.* at ¶ 24. By this time, Gabriel and the investors it led and the board members who represented them had effective control of NetScaler and forced Susai, who then controlled approximately 20% of the company's stock, to step down as CEO, although he remained the Chairman of the Board and an employee of the company. *Id.* at ¶¶ 25, 26. Defendant Jagadeesh was thereafter appointed CEO and President. *Id.* at ¶ 27.

United States District Court
For the Northern District of California

By 2002, NetScaler was in need of a significant infusion of capital. *Id.* at ¶ 29. In October of that year, Sequoia Capital opened negotiations for what is now known as the "Series 1 Financing," by which Sequoia eventually secured 60% ownership of NetScaler by the end of 2002. As a condition to the Series 1 Financing, the existing shareholders of the company were to be diluted. *Id.* at ¶36. The financing was accomplished through a series of transactions including a stock conversion, a reverse stock split, amendments to a stock option plan, and the Severance Agreement with Susai ("Agreement," (FAC, Ex. B)), which reduced Susai's stock holdings and voided a voting agreement between Susai and other shareholders. The Agreement was executed on December 17, 2002. Thereafter, the Series 1 Financing was consummated and new equity positions were established. *Id.* at ¶¶ 36-43. In the end, Susai terminated all connection with NetScaler and his equity in the company was reduced to 3% of the post-Series 1 stock in the company. *Id.* at ¶ 42.

The terms and agreements regarding Susai's stock ownership were memorialized in the Agreement. The Agreement also included a release clause and an expansive arbitration provision. FAC, Ex. B at ¶ 9 (emphasis added). The release clause, entitled "Release of Claims" states that Susai and Netscalar, including its employees, officers, investors, and shareholders, mutually release each other from

> any claim, duty, obligation, or cause of action relating to any matters of any kind, whether presently known or unknown, suspected or unsuspected, that [they] may possess arising from any omissions, acts or facts that have occured . . . [including] any and all claims relating to, or arising from, Mr. Susai's ownership . . . of shares of stock in the Company, including without limitation, any claims for fraud, misrepresentation, breach of fiduciary duty, breach of duty under applicable state corporate law, and securities fraud under any state or federal law.

*Id.* ¶ 3(b). The parties further agreed to the release of "any and all claims for . . . fraud; fraudulent inducement; negligent or intentional misrepresentation; unfair business practices . . . [and] any and all claims for violation of any federal, state, or municipal statute." *Id.*

The arbitration provision states:

> The Parties agree that any and all disputes arising out of the terms of this Agreement, their interpretation, or any of the matters herein released, shall be subject to binding arbitration . . . **The Parties hereby agree to waive their right to have any dispute between resolved in a court of law by a judge or jury.**

*Id.* ¶ 9 (emphasis in original). Additionally, the parties waived their rights to the protections afforded

2

United States District Court
For the Northern District of California

by California Civil Code section 1542, which provides that a general release does not extend to claims of which the parties are not aware of at the time of the execution of the release.[1]

**II.    The Present Lawsuit**

In 2005, NetScaler was acquired for $325 million by Citrix. *Id.* at ¶ 53. As the FAC relates:

> Shortly after the acquisition, Susai learned that either the day after or very shortly after he had entered into the December 2002 agreements, disposing of his pre-Series 1 stock in NetScaler, the option holders [who] remained with the Company after the Sequoia round and had been employed for four years were immediately vested in 70% of their options. Under all the circumstances, the intention to grant such options to those persons existed before and as of the time Susai was induced to approve the transactions and agreements alleged herein above.

*Id.* at ¶ 54.  Susai states that he was "shocked" by this information.  Opp. at 3. Susai states, in relaying the gravamen of his complaint, that

> In 2002, he had been unaware of defendants' pre-Series 1 intention to grant themselves such post-financing accelerated options. The intention was concealed from Susai, even though defendants did confirm that options would of course be granted to continuing employees. But defendants concealed the most material of all information about the options, under the circumstances that existed in late 2002.

*Id.* The FAC further states:

> Had Susai known of the feature, he would have, *inter alia*, used his then-existing holdings and position in NetScaler to insist that he receive options with the vesting feature . . . and/or otherwise receive fair value for his pre-Series 1 stock in NetScaler—proportionate in value to what Jagadeesh, Bolander and others received for their pre-Series 1 stock.

FAC at ¶ 46.

Susai filed this lawsuit on January 3, 2007, over four years after the December 2002 Agreement was consummated. Susai alleges claims for violation of Rule 10b-5, fraud, deceit, negligent misrepresentation, breach of fiduciary duties, unjust enrichment, and violation of the California unfair business practices law, all based on defendants' alleged concealments, as well as their "oppression and coercion of Susai as a minority shareholder." *See* FAC at ¶¶ 84-98.

The original complaint filed by Susai made no reference to the Agreement. However, after

---

[1]Section 1542 states: "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor." Cal. Civ. Code § 1542.

1  defendants informed Susai of their intention to enforce the arbitration provision of the Agreement during

2  a meet-and-confer discussion on March 5, 2007, Susai amended his pleadings to assert a cause of action

3  alleging the invalidity of the arbitration and release provisions in the Agreement. Pet. to Compel. at

4  ¶ 9. Susai alleges in his Seventh Claim that in 2002, defendants not only knew that their actions would

5  "lead to Susai's loss of his rightful interests in NetScaler," but also "knew that, upon discovery by Susai

6  [of defendants' scheme], he would assert claims for relief against them for the loss of such interests."

7  *Id.* at ¶ 103. "With the specific intent of avoiding such claims and while concealing from Susai that the

8  claims were about to arise, defendants procured from him the release and arbitration provisions that are

9  the cornerstones of the defense motions now before the Court." Opp. at 4; *see* FAC at ¶¶ 104-108.

10  ## LEGAL STANDARD

11      A party to a valid arbitration agreement may "petition any United States district court for an

12  order . . . directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C.

13  § 4. The district court must only determine whether an arbitration agreement exists and whether it

14  encompasses the dispute at issue. *See Lifescan, Inc. v. Premier Diabetic Servs., Inc.,* 363 F.3d 1010,

15  1012 (9th Cir.2004); *see also Chiron Corp. v. Ortho Diagnostic Sys., Inc.,* 207 F.3d 1126, 1130 (9th

16  Cir.2000). Any doubts concerning the scope of arbitrable issues should be resolved in favor of

17  arbitration. *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24-25

18  (1983). Thus, arbitration should only be denied where "it may be said with positive assurance that the

19  arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T*

20  *Technologies, Inc. v. Communication Workers,* 475 U.S. 643, 650 (1986) (quoting *United Steelworkers*

21  *v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582-83 (1960)).

22      Arbitration provides a forum for resolving disputes more expeditiously and with greater

23  flexibility than litigation. *Lifescan,* 363 F.3d at 1011. The Federal Arbitration Act provides that

24  arbitration agreements governed by the Act "shall be valid, irrevocable, and enforceable, save upon such

25  grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The Act was

26  created to "reverse the longstanding judicial hostility to arbitration agreements" and "to place arbitration

27  agreements on the same footing as other contracts."  *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S.

28  20, 24 (1991).   Section 2 of the Act evinces "a liberal federal policy favoring arbitration agreements,

not withstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

## ANALYSIS

Defendants raise two primary arguments in their petition: 1) since the arbitration clause states that disputes relating to the "interpretation" of, or matters "released" under, the Agreement are to be submitted to the arbitrator, the questions of the validity and scope of the arbitration clause are to be decided by the arbitrator and not this Court, and 2) assuming the Court reaches the issue of the scope of the arbitration clause, plaintiff's claims are clearly within the scope of the expansive clause. In response, Susai argues that 1) in the absence of a "clear and unmistakable" intention to submit the specific issue of the scope of an arbitration clause to the arbiter, this Court must decide that issue, and 2) since the FAC does not allege that the Agreement as a whole is invalid but only specifically challenges the arbitration provision, this Court must decide the issue of the validity of the arbitration clause.

## I.     Arbitrability

This Court has already considered – and rejected – Susai's first argument. In *Anderson v. Pitney Bowes, Inc.*, 2005 WL 1048700 (N. D. Cal. May 4, 2005) (Armstrong, J.), this Court held that where the parties "'clearly and unmistakably' empowered an arbitrator to determine arbitrability, the Court must compel arbitration." *Id.* at *2 (citing *AT & T Technologies*, 475 U.S. at 649). This Court found a "clear and unmistakable" intention to submit the question of arbitrability to an arbitrator when the agreement provided that "the Arbitrator shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, or enforceability or formation of this Agreement, including . . . any claim that all or any part of this Agreement is void or voidable." *Id.* at *3. Susai asserts that, in contrast, "[n]o such language exists in the Arbitration Provision here."

This Court disagrees. The arbitration clause in this case states that "any and all disputes arising out of the terms of this Agreement, their *interpretation*, or *any of the matters herein released*" shall be subject to binding arbitration. FAC, Ex. B at ¶ 9 (emphasis added). While the arbitration clause in *Anderson* specifically submitted to the arbitrator "any claim that all or any part of this Agreement is void or voidable," the arbitration clause here broadly states that "any of the matters *herein released*" shall

be subject to arbitration. By incorporating the matters described in the release clause, the parties effectively submitted *any* dispute between them to the arbitrator, including allegations of fraud in the inducement of agreement to the arbitration provisions. The release clause states that "any claim, duty, obligation, or cause of action relating to any matters of any kind . . . including without limitation, any claims for fraud [or] misrepresentation" are thereby released. Susai absurdly argues that since the arbitration clause literally covers "matters herein released," in order to determine the scope of the arbitration clause, the Court must first determine which matters are in fact "released" by the release provision, which in turn requires the Court to determine whether the release and arbitration clauses are themselves valid, which would require an inquiry into precise the matters at issue, i.e., whether Susai was fraudulently induced into entering into those provisions. However, Susai's tortured interpretation would render the "matters herein released" language in the arbitration provision nonsensical, as it would mean that "released" matters -- matters that by definition could not be submitted to the Court or the arbitrator -- would be submitted to the arbitrator.

When the language of a contractual provision is unintelligible if read literally, a court may give the language a practical interpretation which makes it intelligible. *U.S. v. Data Translation, Inc.*, 984 F.2d 1256, 1260 (1st Cir. 1992) (citing Restatement (Second) of Contracts §§ 200, 203 (1981)). While perhaps not a paragon of clarity, the intended meaning of the arbitration clause is clear enough: all of the claims described in the release clause are to be submitted to the arbitrator, and it is for the arbitrator, and not this Court, to determine the scope and validity of the release clause, and by incorporation, the scope and validity of the arbitration provision.

Finally, the arbitration provision provides that any dispute related to the "interpretation" of the "terms" of the Agreement shall be submitted to the arbitrator. The question of the scope of the arbitration clause is precisely a question of the interpretation of the terms of the Agreement. Parties to an arbitration agreement are free to submit questions related to the scope of the agreement to the arbitrator. *AT & T Technologies*, 475 U.S. at 649. The exceedingly broad arbitration provision in this case covers disputes related to the scope of the arbitration provision itself, and therefore this issue must be submitted to the arbitrator.

## II.      Validity of the Arbitration Clause

Susai also argues that because he specifically challenges the validity of  arbitration and release provisions but does not seek to invalidate the Agreement as a whole, this Court must pass on the issue of the validity of the provisions, which inquiry would require the Court to determine whether Susai was in fact defrauded -- the very claim that forms the basis of his lawsuit. In *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006), the Supreme Court recognized that challenges to arbitration agreements fall into two categories: (1) those "challeng[ing] specifically the validity of the agreement to arbitrate;" and (2) those "challeng[ing] the contract as a whole, either on a ground that directly affects the entire agreement ( e.g., the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." 126 S.Ct. at 1208.

In clarifying its interpretation of *Buckeye*, the Ninth Circuit in *Nagrampa v. MailCoups, Inc.,* 469 F.3d 1257, 1268-69 (9th Cir.2006), sitting en banc, held that "when the crux of the complaint challenges the validity or enforceability of the agreement containing the arbitration provision, then the question of whether the agreement, as a whole, is unconscionable must be referred to the arbitrator." *Id.* at 1263-1264 (citing *Buckeye*, *supra*, 546 U.S. 440). However, the court continued, "[w]hen the crux of the complaint is not the invalidity of the contract as a whole, but rather the arbitration provision itself, then the federal courts must decide whether the arbitration provision is invalid and unenforceable." *Id.* at 1264.

As an initial matter, it appears that Susai's seventh claim alleging the invalidity of the arbitration provision was added only once Susai became aware that defendants intended to compel arbitration. As noted above, the original complaint filed by Susai made no reference to the Agreement. However, after defendants informed Susai of their intention to enforce the arbitration provision of the Agreement during a meet-and-confer discussion on March 5, 2007, Susai amended his pleadings to assert a cause of action alleging the invalidity of the arbitration and release provisions in the Agreement. Pet. to Compel at ¶ 9. Specifically, Susai alleges  that defendants knew that their actions would "lead to Susai's loss of his rightful interests in NetScaler," and that, "[w]ith the specific intent of avoiding such claims and while concealing from Susai that the claims were about to arise, defendants procured from him the release and arbitration provisions that are the cornerstones of the defense motions now before the Court." Opp. at

4; *see* FAC at ¶¶ 104-108.

However, there is no question that the "crux" of Susai's complaint is that he was fraudulently induced into entering into the Agreement as a whole.  Susai does not allege facts relating to the supposedly fraudulently induced arbitration provision that are independent of defendant's alleged scheme to defraud Susai of his rights by enticing him to entering into the Agreement as a whole  under false pretenses. *Cf. Nagrampa*, 469 F.3d at 1271 (examining the "crux of the complaint" in that case made it "abundantly clear" that plaintiff's challenge went specifically, and only, to the arbitration clause, where plaintiff alleged contract was one of adhesion, and only filed suit only after defendant successfully moved the arbitral venue for the contract claims at issue to the other side of the country and the AAA rejected her petition to waive the arbitral fees). While he does not specifically allege the invalidity of the Agreement (which he apparently avoided doing to avoid triggering the arbitration provision, as described above), all of the damages he describes flow from the his claim that, had he known all of the purported facts at the time he entered into the Agreement, he would not have done so. There is no factual basis which distinguishes Susai's other claims from his challenge to the arbitration provision. Accordingly, under the rule articulated in *Buckeye* and *Nagrampa*, the question of the validity of the arbitration clause must be referred to the arbitrator. Where, as here, there is no independent challenge to the arbitration clause in that the plaintiff alleges the same facts as alleged in the underlying dispute to void the arbitration clause, the court must honor the arbitration clause. *Western Hospitals Federal Credit Union v. E.F. Hutton & Co., Inc.*, 700 F.Supp. 1039, 1043 (N.D. Cal. 1988) (Henderson, J.). Susai may not "bootstra[p] the conduct for which [he] is suing [defendants] into a separate reason for voiding the arbitration clause." *Id.* at 1042. Susai's cynical attempt to avoid this sound rule by simply adding a cause of action challenging the validity of the arbitration clause therefore fails.

Because the Court does not reach the merits of the case, the motion to dismiss is denied as moot.

## CONCLUSION

For the foregoing reasons, the defendants' Petition to Compel Arbitration [Docket No. 24] is GRANTED, and this case is STAYED pending arbitration. The Motion to Dismiss [Docket No. 22] is DENIED AS MOOT. Plaintiff's Request for Judicial Notice [Docket No. 30] is GRANTED.

IT IS SO ORDERED.

Dated:    6/14/07

_Saundra B Armstrong_

SAUNDRA BROWN ARMSTRONG
United States District Judge